**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ALQUAN MUSLIM, | : | |
| Plaintiff, | : | Civ. No. 18-17341 (GC) (TJB) |
| | : | |
| v. | : | |
| | : | |
| IHUOMA NWACHUKWU, | : | **OPINION** |
| | : | |
| Defendant. | : | |

**CASTNER, District Judge**

Plaintiff, Alquan Muslim ("Plaintiff" or "Muslim"), is a state prisoner currently incarcerated at the New Jersey State Prison ("NJSP") in Trenton, New Jersey. Presently pending before this Court is Defendant Dr. Nwachukwu's ("Defendant") motion for summary judgment seeking dismissal of Plaintiff's Complaint, which he brings pursuant to 42 U.S.C. § 1983. (*See* ECF 119.) For the reasons explained in this Opinion, Defendant's Motion for Summary Judgment on Plaintiff's Eighth Amendment deliberate indifference and First Amendment retaliation claims is **DENIED**. At this time, the Court also appoints pro bono counsel for Plaintiff for the limited purpose of settlement.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### a.  The Summary Judgment Record

#### 1.  Medical Transportation Passes at NJSP

Plaintiff is an inmate at New Jersey State Prison ("NJSP") and has been incarcerated there since 1997. (ECF No. 126-1, Pl. Dep. at 12:5-13:5.) Plaintiff's Complaint arises from Defendant's refusal to approve a medical transportation pass ("medical pass") for offsite medical appointments,

despite his serious medical conditions and the recommendations of other medical providers at NJSP, as well as her decision to revoke the medical pass issued by another provider. (*See* Generally ECF No. 1.) Plaintiff contends Defendant denied him a medical pass in retaliation for the lawsuits and grievances he filed against her. (*See id.*)

Dr. Nwachukwu is an employee of Rutgers, the State University of New Jersey, and became the medical director at NJSP in June 2017. (*See* ECF 119-1 at 24, Nwachukwu Written Deposition Answers). Defendant contends that NJSP provides only three modes of transportation for inmates to attend medical appointments outside of the prison. These forms of transportation are: (1) an ambulance for inmates who need to travel on or with a stretcher such as post-surgical patients being transported to and from the hospital; (2) a wheelchair van for patients with medical conditions necessitating wheelchair use, such as patients who are paraplegic, have weakness in their limbs due to chemotherapy or whose lower extremities have been amputated; and (3) a standard NJDOC vehicle which is used for able-bodied, ambulatory inmates. (*See id.* at 39; *see also* ECF No. 142-1, Nwachukwu Decl. at ¶¶ 2, 3-4 (stating that inmates who are ambulatory or capable of walking on their own do not require a wheelchair and do not meet the criteria for wheelchair transportation and that it is critical that this criteria is strictly followed).

Defendant has not provided any policy documents or other evidence that NJDOC or the medical department limits medical passes to non-ambulatory or wheelchair bound inmates. Plaintiff testified that he learned about this purported criteria for the first time during the litigation. (ECF No. 126-1, Pl. Dep. at 53:4-10.)

Plaintiff also disputes Defendant's claim that only non-ambulatory inmates can obtain a medical pass or ride in the medical van. He testified that he previously had a medical pass even

though he "wasn't in a wheelchair." (*Id.* at 44:14-23.) He also testified that other inmates who were not in wheelchairs had medical passes. (*Id.* at 51:18-52:11.)

Plaintiff further testified that he had a medical pass because he has congestive heart failure and "has problems breathing in [the standard] van [because] [t]here is no air circulation."[1] (*Id.* at 28:21-29:6.) Plaintiff further testified that Dr. Nwachukwu or the medical department issued him a 90-day medical pass in November 2015 due to "complications with breathing on the van and with [his] heart." (*Id.* at 28:16-20; 32:23-33:17; 44:14-23; *see also id.* at 43:22-24 (describing the complications as sweating, chest pain, and throwing up).) According to Plaintiff, the medical pass meant that he could not travel in the standard van and must travel by medical bus or wheelchair van. (*Id.* at 37:21-38:3.) Although the pass was written for 90 days, Plaintiff testified that he was not required to travel in the standard van after the 90-day period expired. (*Id.* at 38:4-14.)

Plaintiff also testified about the conditions in the standard van that makes it difficult for him to breathe. He testified that the standard NJDOC van was changed in the mid-2016 timeframe. (*Id.* at 32:19-22.) According to Plaintiff, the new standard van can seat four to five people on each side and has cages that surround the seating areas. Plaintiff also testified that the new standard van has a divider between the back and front of the van, and the back of the van is windowless and has inadequate ventilation.[2] (*Id.* at 35:23-36:14.) Plaintiff contrasts the standard van with a fourth

---

[1] Plaintiff's medical records for the 2017-2019 period list "angina pectoris" and "cardiomyopathy, dilated EF 46%" under the "Diagnosis" section, and Plaintiff was taking medication for angina pain. (*See e.g.*, ECF No. 117 at 45; *id.* at 11.)

[2] Plaintiff also testified that corrections officers did not secure him with a seatbelt during rides in the standard van, and it is unclear whether the standard vans have seatbelts that corrections officers fail to use or if the vans only have a strap that the prisoner can hold. (*See id.* at 31:14-32:22.)

type of transportation, a medical bus that has windows and ventilation.[3] (*Id.*)  In his opposition brief, Plaintiff provides additional information about the interior of the standard van:

> DOC's regular transport vans are nothing more than a small steel box built into the back of a regular sized van with two steel benches on each side of the van, divided by a steel wall between them.  Each bench holds up to four (4) or five (5) inmates on each side sitting shoulder-to-shoulder.  Due to the lowered ceiling created by the box, prisoners must sit in a hunched-over position for the duration of their transport.  It have [sic] little to no air or any kind of ventilation; temperatures often reach well over 90-100 degrees during the spring and summer seasons in them shaped like a tiny metal box[.]

(ECF No. 123, Plaintiff's Opposition Brief at 19.)

Plaintiff's medical records suggest that the medical pass enabled Plaintiff to ride in the front of the standard van or in another NJDOC vehicle.  (*See, e.g.*, ECF No. 117-1 at 18 (Office visit with Allison Sacks on April 4, 2018) ("Plaintiff advises it is not a wheelchair van it is regular van with a medical pass."); (*Id.* at 20 (Office visit with Allison Sacks on February 27, 2018, stating "Pt. advised that he had a medical pass previously that allowed him to ride in the front or in a medical van (like ambulance) that did not require him to be locked in a small cage.")

### 2. **Plaintiff's Medical Records**

Defendant has provided excerpts from Plaintiff's medical records for the period from January 2017-March 2019, but there are significant gaps in those records.[4]  Plaintiff's deposition testimony and the available medical records, however, support Plaintiff's claim that he had off-site medical appointments for several serious medical conditions.  The records also document his unwillingness to travel to those off-site appointments in the regular DOC van due to his breathing problems and the lack of the ventilation in the standard van.

---

[3] It is unclear if the NJDOC still uses medical buses.

[4] The bates stamps on the medical records indicate that a substantial portion of Plaintiff's medical records have been omitted, and it is unclear if they were produced to Plaintiff in discovery.

Plaintiff testified that he experienced breathing problems in 2017 and that the medical department referred him to an ENT. (*Id.* at 38:15-25.) According to Plaintiff, the consent form he signed stated he would be transported in the wheelchair van, but Defendant would not approve special transportation. (*Id.*) Plaintiff's testimony is consistent with his medical records, which indicate that Plaintiff had a telehealth ENT consultation with Sadeq A. Razvi, MD on January 1, 2017, and complained of "trouble breathing" after the excision of a nasal polyp. (ECF No. 117 at 61.) Plaintiff subsequently canceled his appointment with Dr. Razvi because he was unable to obtain a medical pass. (*Id.* at 64.)

On January 26, 2017, Plaintiff saw James Brewin, APN, ASN, and complained of "not being able to breathe through his nose." (*Id.* at 59.) Provider Brewin noted that Plaintiff refused the transport due to "riding in the back of the van" and that "pt…was told by custody that if Doctor ordered him to ride in fr[ont] of van they would allow him to do that[.]" (*Id.*) Provider Brewin wrote "consulted with SMD and no medical indication for that order." (*Id.*)

On March 28, 2017, Plaintiff met with Inaish Jackson, APN regarding the ENT consultation. Provider Jackson's note states that "Pt refused to get on the DOC transport stating the van is too tight and he cannot breathe." (*Id.* at 58.) On June 17, 2017, Donique Ivery, APN met with Plaintiff for a sick call and told him that there was no medical need for an ambulance or car for transport to the ENT consultation. (*Id.* at 57.)

On July 31, 2017, Plaintiff met with Paulo Verdeflor, NP for a sick call regarding his ENT consult. Provider Verdeflor notes that Plaintiff complains of "chronic difficulty breathing to [sic] right nostril. (*Id.* at 52-53.) Plaintiff told Provider Verdeflor that he refused the transport on July 27, 2017 because he "cannot breath [sic] in the DOC van." (*Id.* at 52-53.) The "plan" section of this one-page record states as follows: "This is a 51 year old [sic] male who is referred here today

5

to discuss refusal of ENT. He states he refused the consult because he states he cannot breath [sic] in the DOC van. – ENT consult re-written. [W]heelchair trans[p]ort." (*See id.* at 54; ECF 123-2 at 9). Although Verdeflor recommended or ordered a wheelchair transport, he entered another note on August 3, 2017: "Discussed with site MD with recommendations: No wheelchair transportation and patient to go via DOC van. <u>Ventilation of van and prison discussed with site MD.</u>" (*Id.* at 55 (emphasis added).)

On August 10, 2017, Plaintiff saw Provider Jackson for a "CCC Cardiac/HTN [hypertension]Visit." At this visit, Jackson "advised pt that he does not meet the criteria for wheelchair transport and ambulance transport for orthopedic consult." (*Id.* at 47.)

On September 5, 2017, Dr. Razvi indicated that Plaintiff still had not completed the ENT consultation and Provider Verdeflor rewrote the order for the ENT consult. (*Id.* at 43.)

Also on September 5, 2017, Plaintiff had a sick call with Kenneth Bass, RN. Bass wrote that Plaintiff was "[h]aving adverse cardiac affect [sic] after coreg d/c'd [discontinued]."[5] (*Id.* at 42.) Defendant does not provide any additional medical records about this incident. Based on later records, it appears that Plaintiff was treated by cardiologist Mark Soffer, M.D. on or around November 6, 2017 for chest pain. (*Id.* at 35.) Dr. Soffer's note from November 6, 2017,[6] indicates that Plaintiff's chest pain may be related to the withdrawal from the beta-blocker:

> IMPRESSION:
> 1. persistent chest pain, possibly related to hypertension in setting of withdrawal from beta-blocker, possibly due to small vessel coronary disease.

---

[5] Coreg is a betablocker used to treat the symptoms of heart failure and high blood pressure. *See* https://coreg.com/patient-information/ (last visited March 23, 2024.)

[6] This note or partial note appears in a later portion of Plaintiff's medical records presumably because the note includes an addendum dated March 17, 2018, which indicates that Dr. Soffer reviewed an additional report. (*See* Medical Records at 35.)

    2. Hypertension on an extremely complex regimen but this appears to be necessary to control his pressure.

    3. Hyperlipidemia is not being treated.

(*Id.*)

Several months later, on March 13, 2018, Plaintiff saw Rashidah Afolarin, APN for a sick call related to Plaintiff's ENT and orthopedic consultations.[7] (*Id.* at 35.) During this consultation, Plaintiff again complained of nasal congestion and "difficulty breathing." (*Id.* at 36.) Provider Afolarin wrote the following note: "Pt. states that he doesn't like the transportation system because he 'can't breath [sic] on the van' Pt. would like a pass to be in the front of the van." (*Id.* at 36.) Plaintiff also complained at this visit of joint pain due to his deformed fingers. (*Id.*) In addition to referring him to the ENT and Orthopedics, Provider Afolarin ordered or recommended the following: "Pass for Pt. to be planced [sic] in front of the van for medical transportation. Pt. verbalized understanding and agreed with this treatment plan." (*Id.* at 37.)

On April 2, 2018, Plaintiff saw Provider Afolarin again for a sick call and complained of back and joint pain and was assessed as having "Chronic lumbar spine pain." (*Id.* at 31.) Afolarin also noted that Plaintiff's nasal congestion is "[p]ending ENT consultation. Pt. not willing to travel on current transportation." (*Id.*) Although this provider previously recommended a medical pass for Plaintiff to be placed in the front of the van, Afolarin wrote that Plaintiff "continues demanding for special transportation arrangement that is not medically necessary." (*Id.* at 32.)

---

[7] On or about September 7, 2017, Plaintiff also had an orthopedic consultation with Scott Miller, MD, who wrote that Plaintiff was evaluated for surgery to correct deformed little fingers on both hands. Although Plaintiff was scheduled for surgery, he refused transportation. (*Id.* at 39.) On October 26, 2017, Plaintiff had a second consultation with Dr. Shakir, M.D., who notes that Plaintiff stated that "he cannot breath [sic] when he is sitting in the back of the van." (*Id.* at 39.) Dr. Shakir declined to schedule him for the surgery until his primary care physicians arranged transportation.

On April 12, 2018, Nwachukwu wrote the following chart note: Discussed with patient again that there is a van available for him to go for his appointment and there is no clinical indication for sitting in front of the van." (*Id.* at 34.)

On April 19, 2018, Plaintiff met with Provider Jackson regarding his refusal to accept transportation in the standard van. (*Id.* at 29.) Provider Jackson wrote that Plaintiff stated that "the van is too small and tight. Counseling ineffective." (*Id.* at 29.)

Plaintiff testified that he saw Provider Jackson again on May 31, 2018, for back pain and x-ray findings. (ECF No. 126-1, Pl. Dep. at 56:6-11; *see also* ECF No.123-1, Plaintiff's Decl. at 2.) The medical records provided by Defendant, however, do not include the May 31, 2018 visit. Plaintiff testified that Provider Jackson ordered an MRI of his spine and told Plaintiff he would be transported by wheelchair van. (*See* Pl. Dep. at 57:12-59:6.) Plaintiff further testified that he went to physical therapy for his back pain and that the physical therapist recommended an MRI.[8] (Pl. Dep. at 58:5-14.)

On June 14, 2018, Plaintiff refused a trip to St. Francis Medical Center for the MRI due to "Transportation issues." (ECF No. 117 at 28.) On June 18, 2018, Plaintiff saw Provider Jackson, and she entered the following chart note: "reordered MRI LS wheelchair transport, reviewed X ray LS findings and discussed PT eval, recommended pt transport via wheelchair due to back condition." (*Id.* at 26.)

On June 27, 2018, however, Diane Baca, LPN entered a note stating that inmate refused treatment and wrote the following: "pt states he will only travel by handicapped vehicle." (*Id.* at 25.)

---

[8] Defendant has not provided the medical records regarding Plaintiff's physical therapy visits or Provider Jackson's original order for the MRI.

On September 21, 2018, Plaintiff saw Donique Ivery, APN for a sick call for "persistent back pain" and pain in his feet. (*Id.* at 22-23.) The "Gait and Station" note stated the following: "normal, can undergo exercise testing and/or participate in exercise program"; however, Provider Ivery wrote that Plaintiff "has trouble bending forward at the waist, even 20 degrees." (*Id.*) Provider Ivery encouraged Plaintiff to go to the MRI using regular transport and notes that his foot pain is consistent with osteoarthritis and his x-ray of the lumbar spine indicates arthritis as well as stenosis. (*Id.* at 24.) On October 1, 2018, Plaintiff declined the MRI screening if he could not be transported in a wheelchair van. (*See id.* at 21.)

Plaintiff subsequently had another telemedicine visit with cardiologist Dr. Soffer on October 3, 2018, "because of the development of progressive exertional chest pressure and dyspnea [shortness of breath][9] in an EKG showing inferolateral T-wave inversion."[10] (*Id.* at 11.) Soffer recommended that Plaintiff undergo an echocardiogram and a nuclear stress test. (*Id.*)

On October 19, 2018, Provider Baca and/or Susan Springler, RNC met with Plaintiff to obtain his consent for the nuclear stress test, but Plaintiff stated that he would not go in the standard DOC van. (*Id.* at 20-21.) Plaintiff completed the stress test prep on October 24, 2018, and he continued to ask for a wheelchair van. (*Id.* at 18.) Joan Mitchell, RN noted that Plaintiff "states he is not refusing the Stress Test, but the transportation. States he needs a handicap van…." (*Id.* at 19.)

---

[9] According to the Cleveland Clinic, "Dyspnea, or shortness of breath, is the feeling that you can't get enough air into your lungs. It might feel like your chest is tight, you're gasping for air or you're working harder to breathe. Heart and lung conditions are common causes of dyspnea." *See* https://my.clevelandclinic.org/health/symptoms/16942-dyspnea (last visited March 24, 2024).

[10] Once again, this record appears in a later portion of Plaintiff's medical records, and a separate record of Plaintiff's October 3, 2018 telemedicine visit with Dr. Soffer and any related sick visits are not included in the medical records provided by Defendant.

On October 25, 2018, Provider Baca added a "Chart Note for Patient Advocate," which states that Plaintiff has had numerous medical trips scheduled and canceled due to transportation issues. (*Id.* at 17.) According to Provider Baca, Plaintiff stated that he is "claustrophobic and has difficulty breathing in the standard DOC van."[11]  Baca also refers to a mental health chart note, stating "it appears that [Plaintiff] would benefit from extension of medical transport" and indicates that Defendant denied the request for medical transport.[12]

With his opposition papers, Plaintiff has also provided a medical pass signed by Adetutu Mojisola Ogunleye, APN on October 29, 2018.  In the instruction section of the document, Ogunleye wrote the following: "TEMP: 365 DAYS Use Specialty VAN for Transport NOT Standard DOC Van." (*See* ECF No. 123-2 at 13.)

Plaintiff testified that Defendant revoked the medical pass issued by Provider Ogunleye, and that Defendant never told Plaintiff why she revoked the pass.  (Pl. Dep. at 64:1-11; *see also id.* at 66:67:2 (Plaintiff does not recall Dr. Nwachukwu providing a reason for revoking the pass). Plaintiff further testified that Dr. Miller and Nurse Baca originally told him that he would be transported by wheelchair van or have a medical pass, but they later told him that Defendant revoked the pass. (ECF No. 126-1, Pl. Dep. at 64:12-66:12.)

In late November 2018, Plaintiff once again refused to be transported to the stress test because he would need to ride in the standard van. (*See* ECF No. 117, Medical Records at 12-16.)

---

[11]  Provider Baca's statement that Plaintiff says he is claustrophobic contradicts Plaintiff's testimony that his trouble breathing in the standard van is related to his heart condition and lack of ventilation, and the Court does not credit it.

[12]  The chart note also refers to "Dr. Baum" but there are no other references to this individual in the medical records and it is unclear how he is involved in Plaintiff's care.

Subsequently, in December 2018, Plaintiff had the EKG of his heart, presumably at NJSP. (*See id.* at 5.)  On January 16, 2019, Plaintiff had a "Cardiology Consultation Telemedicine" visit with Dr. Soffer, who states the following in his report:

> HISTORY OF PRESENT ILLNESS:
>
> Mr. Muslim is a 53-year old African American Man with a history of hypertension, hyperlipidemia, normal coronary arteries on coronary angiogram in 2007, negative lexigram stress test in 2015, who I last saw in telemedicine clinic on October 3, 2018 because of the development of progressive exertional chest pressure and dyspnea in an EKG showing inferolateral T-wave inversion.  At that time, I was concerned that he might have developed significant coronary artery disease and recommended that he have an exercise nuclear stress test and an echocardiogram.  The echocardiogram was technically poor, but grossly normal.
>
> The record states that Mr. Muslim refused to have a nuclear stress test done.  On speaking with him, he says that he is not comfortable riding to the hospital in the usual van and requests that he be transported in a handicap van and that if this is done he will agree to have the stress test done.  He is still having symptoms.
>
> Please refer to my previous consultation for other details,
>
> IMPRESSION:
> 1. It is possible that Mr. Muslim has developed coronary disease.
> 2. Hypertension has been reasonably well controlled
> 3. Hyperlipidemia. LDL is below the target of 70.
>
> SUGGESTIONS:
> 1. I think it would be in his interest to have a nuclear stress test done, but I have told him the logistics of transportation must be agreed upon between him and the prison authorities and I asked this be done in the interest of his medical care.
> 2. Return to telemedicine clinic after the nuclear stress test.

(*Id.* at 11 (emphasis added).)  The report was electronically signed by Inaish Jackson on January 23, 2019.  (*See id.*)

On February 7, 2019, Plaintiff had an office visit for "CCC Cardiac/HTN Visit/Endo" at NJSP with Provider Jackson, who listed Plaintiff as "ambulate[.]"  (*Id.* at 4.)  At this visit, Provider Jackson reviewed "the importance of completing recommended testing by Cardiologist," i.e., the

nuclear stress test ordered by Dr. Soffer. (*Id.* at 5; *see also Id.* at 9 ("Discussed in detail the importance of completing the recommended stress testing, per patient there is no need to schedule the recommended test from Cardiology if there is no change in DOC transportation. Patient wants to follow up with MD regarding transportation.")  Plaintiff's stress test was rescheduled for February 11, 2019, and he was scheduled for a follow-up cardiac appointment in three months. (*Id.* at 6.)

On March 25, 2019, Plaintiff completed the nuclear stress test prep, but on March 26, 2019, Diane Baca, LPN entered a note stating: "Refusal of Stress Test." (*Id.* at 1-2.) Plaintiff apparently refused to be transported because the "wrong van was brought" and Baca entered the following comment: "Agreement was made with DOC Major for a different van than what was provided. Van that was provided for NJSP officers to transport pt in was the same van as CTU brings. No other vehicle was available at this time." (*Id.* at 1.) Defendant has not provided any medical records beyond March 26, 2019.

Plaintiff has provided evidence showing that he received the MRI, nuclear stress test, and other off-site medical treatment on October 1, 2019, and was transported by wheelchair van on that date. (*See* ECF No. 123-2 at 7.) Plaintiff also submitted a copy of the MRI that was performed on October 1, 2019. (*Id.* at 15.) His diagnosis is listed as degenerative disc disease, most severe at L4-5. (*Id.*)

Plaintiff has testified that he suffered cardiac arrest in 2020 and spent three months at St. Francis Medical Center. (ECF No. 126-1, Pl. Dep at 12:14-19.) Plaintiff provided medical records from March 2020 that support this testimony. (*See* ECF No. 123-2 at 20-35.) On March 6, 2020, Dr. Amar Narula, MD at St. Francis Medical Center diagnosed Plaintiff with congestive heart failure and paroxysmal atrial flutter. (ECF No. 123-2 at 22). The following day, on March 7,

2020, Plaintiff returned to St. Francis Medical Center with shortness of breath and suffered cardiac arrest. (*Id.* at 24.)  Plaintiff was diagnosed with kidney failure and heart failure with an EGF of about 10%-15%, and his prognosis was listed as "guarded."[13]  (*Id.* at 25.)

Plaintiff testified that he was released from the hospital to South Woods State Prison and returned to NJSP in August 2020.  He was prescribed a wheelchair, and he has either been transferred by an ambulance or in a wheelchair van for his off-site medical appointments since that time. (*See* ECF No. 126-1, Pl. Dep. at 19:4-20:4; 25:17-26:26:4.)  As of his deposition in January 2022, Plaintiff was being treated for congestive heart failure, kidney failure, diabetes, and high blood pressure.  (*Id.* at 14:5-15:6.)

### 3.  The Mental Health Records

It appears undisputed that Defendant referred Plaintiff to mental health professionals at NJSP regarding Plaintiff's refusal to ride in the standard van. (ECF No. 126-1, Pl. Dep. at 67:3-13).  Plaintiff testified that mental health came to see him at Defendant's request.  (*Id.*)  He testified that a female mental health counselor initially visited him, and he told her about his breathing problems, sweating, and chest pain when he would travel in the standard van. (*Id.* at 67:21-69:12.)  When the mental health counselor suggested it was anxiety or "close phobia" [sic],  Plaintiff told her that his symptoms were caused by his heart condition.  (*See id.*)

Plaintiff's mental health records indicate that on February 27, 2018, Plaintiff met with a mental health counselor, Allison Sacks.  Sacks' report states the following:

---

[13] The Court also takes judicial notice of the fact that the New Jersey Appellate Division, writing in November 2020, found that Muslim "suffers from a number of different medical conditions that required him to be hospitalized earlier [in 2020] 'for profound multifactorial shock and multi end organ failure.' At that time, his treating physician did not believe defendant would survive." *State v. Muslim*, No. A-4585-19T4, 2020 WL 6494597, at *1 (N.J. Super. App. Div. Nov. 5, 2020) (affirming denial of compassionate release motion because Muslim "dramatically improved" after treatment).

Met with this . . . Pt out of cell at table on the unit in response to a medical referral. While pt came to the table he was guarded, introduced myself as MH [Mental Health] staff and pt inquired about the contact. He advised that he doesn't have MH issue; advising his dissatisfaction is with medical.

Provided empathetic listening and inquired about the situation. Pt advised that he had a medical pass previously that allowed him to ride in the front or in a medical van (like ambulance) that did not require him to be locked in a small cage. He advised that he had a civil suit and that his medical transport pass was not renewed and he felt this was retaliatory. Pt advised that he has a number of medical issues regarding right nostril (impacting his breathing), heart issues, and now a kidney problem. He understands the importance of medical follow up and advised that he will attend appointments; however he cannot go into the vans and needs medical transport.

Pt discusses symptoms indicative of an anxiety attack – racing heart, shortness of breath, hot, sweating, and feeling dizzy like he is going to pass out and also die of heart attack. He advised that he used to feel this way when was in the heat and housed in the West, but has not felt this way since being in the North. Pt advised that he has been refusing medical treatment when not provided a medical van for well over a year. He denied experiencing any symptoms of anxiety in his daily functioning and advised that it occurs only during transport. Pt is requesting his medical transport back and is receptive and willing to attend his appointments. MHC [Mental Health Counselor] spoke about means in which to manage feelings of anxiety and calm himself including breathing techniques.

Per pt report it appears that he is experiencing symptoms indicative of panic attacks related to transport. He is disinterested in taking medications PRN [as needed medications] for medical trips to ride in the van and is requesting medical transport pass be renewed. Pt does not feel he needs to be included on the SNR [Special Needs Roster] as his anxiety doesn't impact his daily functioning. There was no clinical indication of active thought disorder at this time. Pt's speech was clear/coherent and specific to topic. He was future orientated, his refusing treatment is not due to MH limitation.

(ECF 117-1 at 20-21).

On April 3, 2018, Plaintiff followed up with Sacks and sought help in getting a medical transport pass, but Sacks told Plaintiff that he would have to follow up with the medical department. (*See id.* at 18).

Sacks met with Plaintiff again on October 17, 2018. (*Id.* at 13.) Sacks noted that Plaintiff told her that he needed to get an MRI and visit a specialist. (*Id.*) Sack's notes are largely redundant of the visit in February 2018. She again noted "that it appear[ed] that [Plaintiff] me[t] the criteria for Panic Disorder (transportation related)[.]  However [Plaintiff] does not want medications nor does he want to be added to the SNR [special needs roster]. (*See id.* at 13). Sacks also stated that "Plaintiff was future oriented, his refusing treatment is not due to MH limitation; however, it appears he would benefit from extension of medical transport." (*Id.* (emphasis added.)

Plaintiff testified that he told Sacks he had a heart condition and that Sacks told him that she spoke to her "boss" who recommended that Plaintiff be placed on the "proper van." (Pl. Dep. at 69:13-16.) Plaintiff further testified that Sacks asked him, "What's this problem with you and Dr. Nwachukwu?  She don't want you to have nothing." (Pl. Dep. at 69:13-71:15; *see also id.* at 72:24-73:14.)

The record supports Plaintiff's testimony that Sacks and/or her supervisor recommended Plaintiff for medical pass.  On October 25, 2018, Dr. Flora DeFilippo entered the following note: "[t]his is a late entry for a consult with medical for pt's request for medical van to medical appointmen[t]s.  Dr. N did not think this was appropriate and declined to write the order.  Dr. N knows this pt." (*See* ECF No. 117-1 at 12-13; *see also* ECF No. 123-2 at 12.)

On April 18, 2019, Plaintiff met with Sacks again in response to a request by Dr. Nwachukwu. (*Id.* at 8.)  Plaintiff was cordial until Sacks informed him that medical put in another referral because he had a medical trip coming up at St. Francis Medical Center.  Plaintiff stated again that he had a medical pass previously but it was not renewed and that the renewal was being denied in retaliation for a lawsuit Plaintiff filed. (*Id.*)  Sacks again noted Plaintiff's symptoms when he is shackled in the van, which she viewed as symptoms of a panic disorder:

> Pt. discusses the [sic] when he is shackled and locked in the similar cages he experiences the following symptoms—racing heart, shortness of breath, hot, sweating, racing thoughts and feeling dizzy like he is going to pass out and also die of heart attack MHC discussed that these are symptoms of panic—Pt. stated "If you say so, I don't know all that but they didn't happen in the medical van."

(*Id.* at 9.) Sacks also discussed "medication to help with transport," but Plaintiff "adamantly refused the need for such, when he feels the situation can be remedied without medication." (*Id.*) Sacks also told Plaintiff "about means in which to manage feelings of anxiety and calm himself including breathing techniques" but Plaintiff stated: "I don't mean no disrespect but I don't want medication or skills, all I need is the pass renewed." (*Id.*) Plaintiff also advised Sacks that he does not experience panic/anxiety symptoms in his daily functioning and only experiences it in the cages on the transport vehicles. (*Id.*) Sacks wrote the following:

> It appears that pt meets diagnostic criteria for a Panic Disorder (transportation related). However, pt does not want medications nor does he want to be added to the SNR or learn skills to manage transport. Pt feels the only resolution to this dilemma is to have his medical transport (so he will be on a wheelchair van) renewed.

(*Id.*) Sacks also wrote the following in the "Plan comments:  MHC will consult with medical and supervisor re: pt's symptoms of panic related to transport.  However, he does not want medications or treatment—he only wants a medical transport." (*Id.* at 10.)

On April 22, 2019, Plaintiff was briefly evaluated by Dr. Leonard Douglass, D.O., for "<u>perceived</u> anxiety issues related to transportation" and "regarding assessment for medication related to <u>perceived</u> anxiety issues related to transportation." (*Id.* at 4 (emphasis added).)  Dr. Douglass wrote the following:

> Medical consult request is as follows: Pt was seen previously for anxiety symptoms on transportation out of the prison by mental health to evaluate pt again for need to medication for his symptoms and if he is agreeable.
>
> Today when pt seen urgently regarding this issue and he was not in the least agreeable to discussing the topic "I don't mean any

> disrespect but…" he felt the issue had no MH implications. He feels his issue was only "physical" and blamed medical services for knowing this and trying to get MH involved only annoyed him. He stated he had no MH issues and did not want us involved. Medication was offered as an option and he steadfastly refused to consider it. He notes that he had a "van pass before" and alludes to this as his goal for this situation. This may be related to the EMR [electronic medical record] note of 3/26/19.

(*Id.* at 4-5.)

A week later, on April 29, 2019, Melissa Dettore, PsyD met with Plaintiff at the request of medical at his cell door. Plaintiff reiterated the following: "Not to disrespect, but I have no mental health problems." (*Id.* at 1.) According to Dr. Dettore,

> Mr. Muslim insisted that he does not have any mental health issues and does not want the Mental Health Department to be involved in the matter. He was offered and declined medication to ease possible anxiety during the trip, insisting that the matter is a physical condition, not a mental health condition. He placed the onus of obtaining a van pass on the Medical department, specially referencing his heart and breathing difficulties. He reported he had a van pass on prior trips secondary to his reported heart condition. He believes the medical department is "playing games" and referenced an ongoing legal case against the department. He declined any additional need for mental health support at this time.

(*Id.*) Dr. Dettore noted that Plaintiff "has not been diagnosed with any major anxiety disorder" and "does not present with any symptoms of anxiety, depression, thought disorder, or agitation at this time." Dr. Dettore further determined that there was "no clinical indication for adding [Plaintiff] to the Special Needs Roster" and also determined that "there is no clinical indication that Mental Health needs to further intervene in the transportation matter." (*Id.*)

Notably, neither Dr. Douglass nor Dr. Dettore concurred with Sack's suggestion that Plaintiff's breathing difficulties in the standard van were the result of a panic attack.

### 4. Plaintiff's Lawsuits and Grievances Against Defendant

Plaintiff contends that Defendant refused to provide him with a medical pass, despite the recommendations of several other medical providers, and revoked the pass issued by at least one

provider in retaliation for his lawsuit and grievances.[14]   Plaintiff filed a civil action against Defendant in Mercer County Superior Court on or about April 23, 2018, *see* Muslim v. Nwachukwu, MER L-000860-18, and the state court dismissed the matter without prejudice on or about May 29, 2018.[15]

Plaintiff also testified that he filed grievances against Defendant regarding her refusal to provide him with a medical pass (ECF No.126-1, Pl. Dep. at 75:17-77:9), and he has provided copies of those grievances. (ECF No. 123-2 at 1-8.) The first grievance is dated July 4, 2018, and challenges Defendant's decision to deny the medical pass for an MRI that Provider Jackson ordered or recommended in June 2018.[16]  Plaintiff writes that

> Dr. Nwachukwu continues to retaliate against me to punish me because of the lawsuite [sic] I filed against her and she was served on May 22, 2018.  Dr. Nwachukwu intentionally and maliciously revoked the special-transport-pass that the physical therapist and medical provider prescribed for me, in order to prevent me to travel and get the medical treatment I am in dire need of.  Due to Dr. Nwachukwu's retaliatory intervention, I was not able to make the

---

[14] Plaintiff also alludes to a prior federal lawsuit, and the available record reflects that Plaintiff filed a lawsuit against Lance Carver, Abu Ashan, Carol Gallagher, and Jennifer Rapp regarding alleged inadequate ventilation in his housing unit and an alleged delay in his medical care for chest pain and shortness of breath.  *See generally* Civ. No. 13-3484 (PGS).  It appears that Defendant was the supervising doctor when Plaintiff initially complained of chest pain and shortness of breath.  *See* Civ. No. 13-3484, ECF No. 97-3, Statement of Material Facts at ¶¶ 3-4 (explaining that Plaintiff presented to the clinic with complaints of shortness of breath and chest pain" and that "[Lance] Carver notified the doctor on call, Dr. Ihuoma Nwachukwu, of Plaintiff's condition and obtained orders from her").  Plaintiff did not sue Dr. Nwachukwu in that action, and the Court granted summary judgment to Carver on December 21, 2017.  (*See* ECF No. 110-11.)  On November 8, 2018, the Court dismissed the claims against Rapp under Rule 4m.  (*Id.* at 114.)  The Court granted Ashan's motion to dismiss on October 9, 2019   (*Id.* at ECF No. 139.)  The Court granted Gallagher's motion to dismiss on September 9, 2021. (*Id.* at ECF Nos. 160-161.)

[15] See New Jersey Courts, Judiciary eCourts System - Civil Part, available at https://portal.njcourts.gov/webcivilcj/CIVILCaseJacketWeb/pages/civilCaseSummary.faces?cid =1 (last visited March 23, 2024).

[16] Plaintiff also wrote to Melissa Matthews, Assistant Ombudsman, regarding his need for special transportation and received a response on February 13, 2018, stating that his complaint was referred to the UCHC Acting Statewide Medical Patient Advocate for review. (*Id.* at 17.)

> June 27, 2018, medical trip. I cannot travel in the regular DOC transport van. Thanks.[17]

(ECF No. 123-2 at 1.) Dr. Nwachukwu does not dispute that she was served with Plaintiff's state court lawsuit on or about May 22, 2018, or contend that she was unaware of his state court lawsuit and grievances.

On October 10, 2018, Plaintiff also wrote to Hesham Soliman, MD, Director of Medical Services, regarding his need for a wheelchair van to transport him to get an MRI, nuclear stress test, ENT consultation, and surgery on his hands. (*Id.* at 18.) Plaintiff states that he has a heart condition and has trouble breathing in the standard van, and that Defendant changed the van order and is interfering with his need for treatment. (*Id.*)

Plaintiff filed this civil action against Defendant on or about December 10, 2018, and sought to have Defendant reinstate his medical pass and refrain from further retaliation. In addition to injunctive relief, Plaintiff also sought compensatory and punitive damages. (ECF No. 1, Complaint at 6-7.)

On February 16, 2019, Plaintiff filed another grievance against Dr. Nwachukwu regarding the denial of medical transportation for his nuclear stress test and refers to Dr. Stoffer's January 16, 2019 report that recommends medical transport for Plaintiff:

> I was not able to go to outside hospital for treatment and tests because Dr. Nwachukwu keeps refusing to provide me with adequate medical transportation to punish me because I filed grievances and lawsuits against her. My health and life are at risk due to Dr. Nwachukwu's vindictive actions. In fact, in his 1-16-2019[] consultation report the cardiologist recommended that I be provided with adequate medical transportation. "In the interest of my medical care."

---

[17] Susan Springler responded to Plaintiff's grievance on July 10, 2018, and stated "There is no medical indication for special transport. Your order was canceled in March 2018." (*Id.*) Plaintiff disputed her response and filed an appeal on September 12, 2018. (*Id.* at 2-4.)

(*Id.* at 5.)  Provider Baca provided the following response to the grievance: "You were scheduled for a stress test as well as other tests, but the request for a wheelchair van was not approved by Dr. Nwachukwu." (*Id.*)

Plaintiff filed another grievance on March 1, 2019, regarding the denial of a medical pass for his stress test and reiterated that Defendant was retaliating against him for his filing of grievances and lawsuits. (*Id.* at 6.)  Plaintiff again notes that his cardiologist also recommended that Plaintiff be provided with adequate medical transportation. (*Id.*)  Susan Springler responded to the grievance, stating that Plaintiff is not approved for a wheelchair van and that he was offered transport by NJSP prison custody but he refused.  Plaintiff disputed Springler's response and explained that NJDOC offered him a different van but showed up with the standard van. (*Id.*)  Plaintiff also wrote he needed a stress test, an MRI on his back, an operation on his hand, and an ENT visit for nose bleeds. (*Id.*)  Springler responded on May 17, 2019, stating "We accommodated you with NJSP officer transport.  Medical cannot dictate the vehicle used."[18] (*Id.*)

On November 4, 2019, Plaintiff filed a grievance regarding treatment for his back, stating that he had a neurosurgery appointment on October 29, 2019, and he was denied a special transport. (*Id.* at 7.)  Brandie Burns responded to the grievance, stating there was no order for special transport. (*Id.*)  Plaintiff responds that he was transported to a medical appointment by wheelchair van on October 1, 2019, and Susan Springler informed Plaintiff that he would need to discuss his transportation request with the provider. (*Id.*)

On November 18, 2019, Plaintiff filed another grievance.  He states that he was transported to SFMC by wheelchair van on October 1, 2019, to have a stress test, MRI of his back, and a cat

---

[18] Springler's statement conflicts with Plaintiff testimony that the medical department is responsible for issuing medical passes and informs DOC about the type of transportation they must provide. (*See* 126-1, Pl. Dep. 78:2-21.)

scan on his prostate, bladder, and kidneys. (*Id.* at 8.) He explains, however, that the standard van was provided for his return visit on October 29, 2019. (*Id.*) Plaintiff requested a wheelchair van, complained that Defendant "is playing with [his] health", and reiterated that Defendant is retaliating against him for his lawsuit. (*Id.*) On December 9, 2019, Plaintiff appealed the grievance and complained that Defendant was refusing to schedule him with the ENT for his breathing problems and bleeding. (*Id.* at 8.)

On December 31, 2019, Plaintiff received a letter from Margaret Reed, MA, UCHC Acting Statewide Medical Patient Advocate, regarding a grievance Plaintiff filed about his medical care and noting that medical transportation was arranged for his appointment on December 13, 2019. (*Id.* at 19.)

### b.  Procedural History

As noted above, Plaintiff filed the instant Complaint on or about December 10, 2018, while he was still attempting to obtain a medical pass for off-site appointments, and the case was assigned to the Honorable Anne E. Thompson.  After granting Plaintiff's IFP application, the Court proceeded Eighth Amendment deliberate indifference and First Amendment retaliation claims against Defendant on February 26, 2019. (ECF Nos. 4-5.)  Defendant was served and moved to dismiss the Complaint on May 8, 2019. (ECF No. 14.)  Plaintiff opposed the motion and also filed a motion for a preliminary injunction, seeking to enjoin Defendant from interfering with his medical transportation. (ECF Nos. 20, 22.)  On December 6, 2019, Plaintiff also filed a motion for pro bono counsel (ECF No. 34.)

On December 13, 2019, the Court denied Defendant's motion to dismiss the Complaint. (ECF No. 35-36.)  On March 30, 2020, the Magistrate Judge denied without prejudice Plaintiff's motion for a preliminary injunction and granted his motion for pro bono counsel "for the limited

purpose of investigating Plaintiff's medical qualification for placement in a wheelchair transport van." (ECF No. 42 at 2.) Earlier that month, however, Plaintiff had suffered cardiac arrest and multi-system organ failure and was hospitalized at SFMC. (*See* ECF No. 123-2 at 20-35; ECF No. 126-1, Pl. Dep at 12:14-19.) Pro bono counsel entered an appearance to represent Plaintiff; on April 13, 2020, they informed the Court that they had not yet been able to contact Plaintiff. (*See* ECF Nos. 50, 51, 53.)

On June 30, 2020, Plaintiff notified the Court that he was housed at South Woods State Prison, and sought default against Defendant, as Plaintiff believed that she had not answered his Complaint. (ECF No. 55.) The Magistrate Judge denied the request, noting that Defendant filed her answer, and notified Plaintiff that he was represented by counsel. (ECF No. 57.) On July 22, 2020, Plaintiff advised the Court about his medical crisis and requested pro bono counsel to be appointed for the purpose of discovery. (ECF No. 58.)

On January 15, 2021, pro bono counsel advised the Magistrate Judge that a resolution regarding Plaintiff's claim for injunctive relief had been reached, and that Plaintiff still sought to pursue his claim for monetary damages. (*See* ECF No. 68 at 1.) The Magistrate Judge noted that counsel sought to be relieved after engaging in limited settlement discussions because Plaintiff's claim for monetary damages was beyond the scope of pro bono counsel's limited appointment. (*Id.*) The Magistrate Judge granted the motion to withdraw, and Plaintiff proceeded pro se. (*see id.*)

On May 24, 2021, Plaintiff filed a motion for pro bono counsel, which the Magistrate Judge denied without prejudice. (ECF Nos. 71-72.) On December 9, 2021, Plaintiff filed another motion for pro bono counsel, which the Magistrate Judge denied without prejudice on December 17, 2021. (ECF Nos. 89-90.)

On April 19, 2022, the matter was reassigned to the undersigned.  (ECF No. 99.)

On September 13, 2022, Plaintiff filed another motion for pro bono counsel, which the Magistrate Judge denied without prejudice on January 10, 2023.  (ECF No. 107, 113.)

On March 10, 2023, Defendant moved for summary judgment.  (*See* ECF 119.)  Plaintiff opposed Defendant's Motion.[19]  (*See* ECF No. 123.)  Defendant filed a reply brief in support of her Motion.  (*See* ECF No. 126.)  Plaintiff then filed a sur-reply brief opposing Defendant's Motion.[20] (*See* ECF No. 128.)

On October 31, 2023, the Court directed the parties to provide supplemental briefing and terminated the motion for summary judgment pending the completion of that briefing.  (ECF No. 138.)  That supplemental briefing is now complete.[21]  (ECF Nos. 142, 150.)

On January 10, 2024, Plaintiff filed another motion for pro bono counsel.  (ECF No. 143.) Defendant took no position on that motion (ECF No. 145), and the Magistrate Judge denied the motion on February 8, 2024.  (ECF No. 148.)  By letter dated February 24, 2024, Plaintiff seeks reconsideration of the Magistrate Judge's decision denying his motion for pro bono counsel, and

---

[19] Defendant included only excerpts of Plaintiff's deposition transcript rather than a full and complete transcript.  (*See* ECF 123 at 8).  Plaintiff raised this issue in his opposition brief, and Defendant provided a full copy of Plaintiff's deposition transcript as an exhibit to her reply brief. (*See* ECF 126-1).

[20] Under Local Civil Rule 7.1(d)(6), "[n]o sur-replies are permitted without permission of the Judge to whom the case is assigned."  While Plaintiff was not given leave to file a sur-reply, given his *pro se* status, and in the interest of justice, this Court will consider Plaintiff's sur-reply, particularly in light of the fact that he did not have his deposition transcript when he filed his opposition brief.

[21] Plaintiff has submitted a letter to this Court alleging interference with his medications and medical treatment in April 2023, which are not directly related to his medical transportation claims from 2017 through 2019.  (*See* ECF 130).  Defendant opposes this letter by Plaintiff as an impermissible attempt by him to amend his Complaint.  (*See* ECF 133).  This Court will not consider these new allegations because they are beyond the scope of the complaint and discovery has closed.

Defendant does not oppose the appointment of counsel on a "going forward basis." (ECF No. 152.)

## II.   <u>LEGAL STANDARD</u>

At summary judgment, the moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "If reasonable minds could differ as to the import of the evidence," summary judgment is not appropriate. *See id.* at 250-51. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," no genuine issue for trial exists and summary judgment shall be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## III.   DISCUSSION

### a.  The Eighth Amendment Deliberate Indifference Claim

The Court first considers whether Defendant is entitled to summary judgment on Plaintiff's Eighth Amendment claim that Defendant denied him a medical pass and revoked the medical pass issued by another provider for nonmedical reasons.  The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103–105 (1976).  In order to sustain an Eighth Amendment claim under 42 U.S.C. § 1983, a plaintiff must make (1) a subjective showing that "the defendants were deliberately indifferent to [his or her] medical needs" and (2) an objective showing that "those needs were serious." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999); *see also Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002).

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are serious." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).  The "seriousness" prong requires a plaintiff to demonstrate that the need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987); *see also Pearson v. Prison Health Servs.*, 850 F.3d 526, 534 (3d Cir. 2017) (noting that a medical need is serious where it has been diagnosed by a physician as requiring treatment). At the other end of the spectrum, "where denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious." *Lanzaro*, 834 F.2d at 347.

To act with deliberate indifference to a serious medical need is to recklessly disregard "a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 839 (1994).  It is well

established that deliberate indifference may be shown by "intentionally denying or delaying medical care." *Giles v. Kearney*, 571 F.3d 318, 330 (3d Cir. 2009) (quoting *Estelle*, 429 U.S. at 104). "The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'" *Id.* (quoting *Farmer*, 511 U.S. at 843). There is, however, "a critical distinction" between claims based on inadequate medical care and claims based on intentional denial or delay of medical care. *See Pearson*, 850 F.3d at 535 (quoting *United States ex rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)).

In cases where an inmate challenges the adequacy of his medical care, "mere disagreement as to the proper medical treatment does not support a claim of an Eighth Amendment violation." *Id.* at 535. (internal quotation and citation omitted). In such cases, courts presume that the medical care provided to the plaintiff was adequate, and the plaintiff must show that the medical provider did not exercise professional judgment. *See id.* at 536; *see also White v. Napoleon*, 897 F.2d 103, 108 (3d Cir. 1990) (mere medical malpractice or disagreement with the proper treatment of an illness cannot give rise to a violation of the Eighth Amendment).

A prison official also acts with deliberate indifference if he or she intentionally denies or delays access to medical care or interferes with the treatment once prescribed. *See id.* at 534 (*quoting Estelle*, 429 U.S. at 104-05); *see also Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (explaining that the court has "found deliberate indifference in situations where necessary medical treatment is delayed for non-medical reasons") (cleaned up). "[A] delay or denial of medical treatment claim must be approached differently than an adequacy of care claim," and "there is no presumption that the defendant acted properly" *Id.* at 537. To survive summary judgment in such as case, "[a]ll that is needed is for the surrounding circumstances to be

sufficient to permit a reasonable jury to find that the delay or denial was motivated by non-medical factors." *Id.*

At issue here is whether a jury could find that Defendant acted with deliberate indifference to Plaintiff's serious medical needs and his need for off-site medical treatment when she overruled other medical providers' recommendations that Plaintiff be provided a medical pass and revoked the medical pass issued by Provider Ogunleye. Defendant argues that she was not deliberately indifferent to Plaintiff's need for medical treatment because she exercised her medical judgment and overruled the medical recommendations and orders of the other medical providers. Defendant also contends that she was free to determine that Plaintiff did not qualify for medical transport because he was not in a wheelchair and was provided adequate treatment when she referred him to mental health to address his breathing issues.

If the Court were to accept Defendant's arguments and grant summary judgment, it would need to resolve disputed issues of material fact in her favor. First, Defendant repeatedly contends that Plaintiff did not meet the criteria for a medical pass because such passes are only provided to "patients with medical conditions necessitating wheelchair use," such as paraplegics and amputees. Defendant emphasizes that Plaintiff's medical records indicate that he was ambulatory during the relevant periods at issue in this case.

Although Defendant colloquially refers to the "wheelchair van" and emphasizes that Plaintiff received a medical pass once he was in a wheelchair, the evidence provided by Defendant does not establish that inmates had to be nonambulatory to obtain a medical transportation pass. Indeed, Plaintiff expressly disputes Defendant's allegation that only wheelchair users have medical passes, and he testified in his deposition that he previously had a medical pass even though he was not in a wheelchair. Notably, Defendant does not cite to a NJDOC or Rutgers policy (or a change

in policy) that would explain why Plaintiff previously qualified for a medical pass without being a wheelchair user. Moreover, during the relevant period, several providers recommended and/or ordered medical passes for Plaintiff, including Provider Verdeflor on July 31, 2017, Provider Jackson on July 11, 2018, Dr. DeFilippo on October 25, 2018, and Provider Ogunleye on October 29, 2018. These providers recommended wheelchair transport and/or a medical pass based on Plaintiff's serious medical conditions even though Plaintiff was technically ambulatory.

This evidence suggests that medical providers at NJSP had discretion to recommend and/or order medical passes for inmates with serious health conditions, and that Defendant, as the medical director, had discretion to approve or deny those medical passes based on medical judgment or for other legitimate reasons.

The Third Circuit has not had the opportunity to consider a deliberate indifference claim based on the denial of medical transportation, but the Eighth Circuit's decision in *Turner v. Mull*, 784 F.3d 485, 487 (8th Cir. 2015) is instructive. There, a state prisoner who suffered from a neurological disorder but was able to ambulate, stand, and sit with the use of leg braces and crutches brought Eighth Amendment claims premised on prison officials' failure to provide him with wheelchair transportation on a single occasion. In that case, the wheelchair-accessible van was equipped with a "lift"—that is, a device that raises wheelchair users from the ground to the floor level of the van and vice versa, and the prison restricted the use of the wheelchair van to wheelchair users. *See id.* The prison presented evidence from the transportation supervisor who explained that prisoners must be in a wheelchair to use the wheelchair van due to a risk of falling. *See id.* The transportation supervisor was willing to transport the plaintiff in the wheelchair van, despite that general policy, but, on the day of transport, Plaintiff did not use a wheelchair and had to crawl into the regular van to be transported. *See id.*

The district court granted summary judgment in favor of the defendants on the plaintiff's deliberate indifference claim because the plaintiff was ambulatory and because no medical provider had ordered a wheelchair for him; it further determined that the prison had provided evidence that its policy of requiring prisoners to be in a wheelchair to use the wheelchair van was for their own safety due to the wheelchair lift. *Id.* at 489.

In affirming summary judgment on the Eighth Amendment claim, the Eighth Circuit emphasized that

> no physician ordered or issued a wheelchair for Turner, much less ordered that he be transported in a wheelchair-accessible van—even though Turner sought and obtained medical care for his neurological condition multiple times in 2011. At least one physician specifically deemed that transportation in a wheelchair-accessible vehicle was not necessary for Turner given in part that he was able to "walk with a leg/torso brace" and "able to sit in a regular vehicle."

*Turner*, 784 F.3d at 490. The Eighth Circuit also affirmed because the prison officials "proffered good reasons for enforcing the wheelchair-users-only policy." *Id.* 490.

Plaintiff's case is distinguishable in several meaningful respects. Unlike *Turner*, Plaintiff's medical records, albeit incomplete, show that several medical providers recommended that Plaintiff be provided a medical pass for his serious medical conditions during the relevant time periods and at least one provider ordered a 365-day medical pass for Plaintiff in October 2018. Defendant also fails to provide any justification, medical, safety, or otherwise, for the policy limiting medical transportation passes to non-ambulatory inmates.[22] Finally, as discussed in detail

---

[22] Moreover, even if NJDOC or medical department policy required inmates to be in a wheelchair to qualify for medical transport, Defendant cannot base her medical decisions solely on that policy unless the policy is justified. *See e.g.*, *Natale*, 318 F.3d at 583 ("A reasonable jury could find that" a nurse's adhering to the prison's usual medical policy during an emergency "constituted the delay of medical treatment for non-medical reasons."); *Maclary v. Holwerda*, 595 F. Supp.2d 348, 353–54 (D. Del. 2009) (denying summary judgment to doctor who admitted she made medical decisions solely based upon the medical provider's policies and not upon her informed judgment).

below, Plaintiff, unlike plaintiff Turner, provides sufficient evidence that Defendant denied him a medical pass for nonmedical reasons, i.e., because he filed lawsuits and grievances against her.

Because there is a factual dispute over the criteria for obtaining a medical pass and specifically whether prisoners must be non-ambulatory or wheelchair bound, and because Defendant has provided no medical, safety, or other justification for the alleged policy restricting medical passes to non-ambulatory prisoners, the Court declines to resolve this issue at summary judgment.

Defendant also claims that she adequately addressed Plaintiff's medical needs by referring him to mental health. Whether Plaintiff's inability to breathe in the standard van was a symptom of a panic attack or a symptom of his heart disease is also a disputed issue of material fact that cannot be resolved at summary judgment. Plaintiff's has consistently disputed that he has a panic disorder and has testified that he has a heart condition and is unable to breathe in the standard van due to inadequate ventilation. Plaintiff further testified that he told the mental health counselor that his breathing difficulties in the standard van were related to his heart condition and that Sacks told him she spoke with her supervisor who would recommend that Plaintiff be placed on the medical van. The record indicates that Dr. DeFilippo consulted with Defendant on October 25, 2018, about Plaintiff's request for a medical van to medical appointments, but Defendant did not think it was appropriate. And although Sacks' written notes suggest that she believed Plaintiff's symptoms were consistent with a panic disorder, she and her supervisor also believed that Plaintiff would benefit from a medical pass. It is also notable that Dr. Douglass' and Dr. Dettore's subsequent evaluations of Plaintiff were equivocal at best and neither determined that Plaintiff's breathing problems and chest pains were symptomatic of panic attacks. On this record, the Court

is unable to determine whether Plaintiff's breathing problems were caused by his longstanding heart condition or a psychological condition, such as panic attacks.

Defendant also emphasizes the general adequacy of the medical care provided to Plaintiff and reframes Plaintiff's claims against her as a disagreement about whether Plaintiff should have a medical transportation pass to his offsite appointments.   Plaintiff, however, contends that Defendant denied him a medical pass and delayed his necessary medical treatment for nonmedical reasons, i.e., because he filed lawsuits and grievances against her.  As outlined above, that type of claim "must be approached differently than an adequacy of care claim." *Pearson*, 850 F.3d at 537. To survive summary judgment in such a case, "[a]ll that is needed is for the surrounding circumstances to be sufficient to permit a reasonable jury to find that the delay or denial was motivated by non-medical factors." *Id.*; *see also Burton v. Clinger*, 2023 WL 4399221, at *2 (3d Cir. 2023) (vacating grant of summary judgment where doctor delayed visiting inmate with a known history of self-harm due to her busy schedule); *Zehring v. Sorber*, No. 20-3195, 2024 WL 233217, at *20 (E.D. Pa. Jan. 22, 2024) (finding that prisoner stated an Eighth Amendment claim against prison medical provider for inadequate transportation funding that delayed his outside medical appointments, which were necessary to treat his serious medical needs).

The Third Circuit has recognized that a medical provider who delays or denies medical care or medical equipment in retaliation for a prisoner's lawsuits or grievances has acted for nonmedical reasons.  In *Romero v. Ahsan*, 827 F. App'x. 222, 226–27 (3d Cir. 2020), for instance, the plaintiff Romero alleged that the defendants deliberately delayed providing him with a hinged knee brace to prolong plaintiff's pain and suffering because plaintiff filed grievances against them. *Id.* (internal citations omitted).  At summary judgment, Romero submitted a copy of a grievance that alleged that the hinged knee brace was being delayed to punish him for filing grievances and

a letter to the manager of the medical department in which he alleged the same. *Id.* Romero also alleged that the medical director made comments suggesting that prisoners who complained would not get surgery. *Id.* Although the Third Circuit affirmed summary judgment on Romero's claims regarding the denial of surgery, the circuit court "conclud[ed] that this summary-judgment evidence, when viewed in the light most favorable to Romero, indicates that there is a genuine issue of material fact concerning whether the delay in obtaining the hinged knee brace was motivated by non-medical factors." *Id.*

Here too, the summary judgment evidence, viewed in the light most favorable to Plaintiff, indicates that there is a genuine issue of material fact as to whether Defendant overruled the recommendations of several medical providers and revoked the medical transportation pass issued by one of those providers because Plaintiff filed two lawsuits and multiple grievances against her. Defendant does not dispute that she was served with Plaintiff's state court lawsuit on May 22, 2018. Shortly thereafter, Plaintiff saw Provider Jackson on May 31, 2018, for back pain and x-ray findings. On June 18, 2018, Plaintiff's pain worsened, and Provider Jackson reordered Plaintiff's MRI and a wheelchair transport, citing his back pain. Defendant overruled Provider Jackson's order for a wheelchair transport. Plaintiff filed a grievance against Defendant on July 4, 2018, claiming that Defendant revoked his special transport pass based on his state court lawsuit. Plaintiff was also apparently experiencing heart-related breathing problems and chest pain, and he had a telemedicine visit with Dr. Soffer on October 3, 2018. Dr. Soffer recommended that Plaintiff undergo a nuclear stress test for suspected coronary artery disease, but Defendant denied him a medical pass for this appointment as well. By October 25, 2018, Dr. DeFilippo, a supervisor in the mental health department, interceded with Defendant to get a medical transport for Plaintiff, but Defendant determined it was not appropriate even though Defendant had referred Plaintiff to

the mental health department.  Provider Ogunleye ordered a 365-day medical pass for Plaintiff on October 29, 2018, and Defendant also revoked that medical pass.  Plaintiff then filed the instant lawsuit in December 2018 and continued to file grievances about Defendant's refusal to provide him with a medical pass.  Plaintiff did not receive the stress test and MRI until October 1, 2019, and Defendant did not formally approve him for a medical pass until after his heart attack and multisystem organ failure.  Viewing these facts in the light most favorable to Plaintiff, a reasonable jury could find that Defendant persisted in her refusal to approve a medical pass for Plaintiff, despite the recommendations of several medical providers, and revoked the medical pass issued by another medical provider because Plaintiff filed two lawsuits and multiple grievances against her.

For these reasons, the Court denies summary judgment on the Eighth Amendment deliberate indifference claim.

### b.  The First Amendment Retaliation Claims

For these same reasons, the Court also denies summary judgment on the First Amendment retaliation claims.  Defendant did not initially move for summary judgment on Plaintiff's First Amendment retaliation claim but argues that the claim is wholly unsupported in the record.[23]  The Court disagrees.

To establish First Amendment retaliation, a prisoner must show: "(1) his conduct was constitutionally protected; (2) he suffered an adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial or motivating factor" in the officials'

---

[23] Defendant also suggests that Plaintiff raised this claim for the first time in his opposition to the motion for summary judgment. Plaintiff's Complaint raises a First Amendment retaliation claim, and the District Court's screening Order clearly proceeds an Eighth Amendment deliberate indifference claim and a First Amendment retaliation claim. (*See* ECF No. 5).

decisions. *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016) (citing *Rauser v. Horn*, 241 F.3d 330, 333-34 (3d Cir. 2001)). If the plaintiff establishes a prima facie case of retaliation, the burden then shifts to defendant to demonstrate that "they would have made the same decision absent the protected conduct for reasons reasonably related to [a legitimate] penological interest." *Rauser*, 241 F.3d at 334.

Defendant essentially concedes that Plaintiff has satisfied the first element by engaging in constitutionally protected conduct through the filing of two civil actions and multiple grievances. However, Defendant argues that Plaintiff fails to show that Defendant took an adverse action against him or that there is a causal connection between the exercise of his constitutionally protected conduct and an adverse action.

As to the second element, an action is adverse if it "would deter a reasonably firm prisoner from exercising his First Amendment rights." *Mitchell*, 318 F.3d at 530. "An adverse consequence need not be great in order to be actionable; rather, it need only be more than de minimis." *Watson*, 834 F.3d at 423 (cleaned up). At least one court in this circuit has held that the denial of access to a wheelchair van is sufficient to deter a reasonable person from filing grievances. *Baez v. Letizio*, 2024 WL 128205, at *2 (E.D. Pa. Jan. 11, 2024) (citing *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (collecting cases). The Court finds that the repeated denial of a medical pass to an inmate with serious medical conditions, like Plaintiff, also constitutes an adverse action.

A prisoner establishes the third element of a retaliation claim "with evidence of: (1) an unusually suggestive proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Watson*, 834 F.3d at 422. Based on the facts set forth in Section III.a. the Court has already determined that a reasonable jury could find that Defendant persisted in overruling other providers'

recommendations that Plaintiff be granted a medical pass for his medical conditions, and revoked the pass issued by another provider because Plaintiff filed two lawsuits and multiple grievances against her. To the extent Defendant contends that she would have made the same decision, she has not shown that she was constrained by a justified policy or that her decisions were based on professional judgment or related to any reasonable penological interests.

For these reasons, the summary judgment is denied on the First Amendment retaliation claim.

### c.  Plaintiff's Renewed Request for Counsel

Finally, Plaintiff seeks reconsideration of the Magistrate Judge's denial of his pro bono counsel motion. Appointment of counsel under 28 U.S.C. § 1915(e)(1) may be made at any point in the litigation and may be made by the Court *sua sponte*. *See Tabron v. Grace*, 6 F.3d 147, 156 (3d Cir. 1993). Because the Court has denied summary judgment, and intends to refer this matter to the Magistrate Judge for settlement, the Court will appoint pro bono counsel for the limited purpose of settlement. The motion for reconsideration is therefore dismissed as moot. The Court will also administratively terminate this case pending the appointment of counsel.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF 119) is **DENIED**. The Court appoints counsel for the limited purpose of settlement, and dismisses Plaintiff's motion for reconsideration as moot. (ECF No. 151.) The Court also administratively terminates this case pending the appointment of counsel. An appropriate Order follows.

DATED: March 28, 2023

GEORGETTE CASTNER
United States District Judge

35